IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Amy D. Hashman,                          :

       Plaintiff,                    :

   v.                                    :        Case No. 2:14-cv-478

                         :        JUDGE MICHAEL H. WATSON
Commissioner of Social Security,        Magistrate Judge Kemp
                         :
       Defendant.                    :

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Amy D. Hashman, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for supplemental security income.  That application was filed on June 17, 2011, and alleged that Plaintiff became disabled on August 1, 2008.

After initial administrative denials of her claim, Plaintiff was given a video hearing before an Administrative Law Judge on January 22, 2013.  In a decision dated February 28, 2013, the ALJ denied benefits.  That became the Commissioner's final decision on March 27, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on July 22, 2014.  Plaintiff filed her statement of specific errors on August 20, 2014, to which the Commissioner responded on September 30, 2014.  Plaintiff filed a reply brief on October 13, 2014, and the case is now ready to decide.

II.  Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 26 years old at the time of the administrative hearing and who has an eleventh grade education, testified as follows.  Her testimony appears at pages 37-53 of

the administrative record.

Plaintiff first testified that she lives in a house with friends and spends her days watching television (typically cartoons). She occasionally goes shopping with a friend but cannot tell if she gets the correct change for a purchase. She can do number puzzles but cannot read. She cannot cook and needs help doing laundry.

Plaintiff has a driver's license and took the oral test, passing it on her second try. She worked in 2011 as an aide for an adult with mental disabilities. She had also been a cashier at Speedway, a job that lasted one day, and as a warehouse helper through a temporary staffing agency. She left that job when she moved. She had done seasonal employment for several years with a company that made and packed caramel apples; she was fired for intentionally putting staples in an apple.

In response to additional questions, Plaintiff said she could use a computer to some extent but found it frustrating. She could read some short words on the computer. She also had been able to send text messages when she had a cell phone. She sometimes took care of her friend's three dogs.

After being asked what prevented her from working, Plaintiff explained she had trouble filling out paperwork and did not get along well with others. In the past, she suffered from depression and anxiety but was not currently being treated. She had anger issues and overate when she was depressed. Most of her school time was spent in special education classes. She had help filling out the paperwork required to apply for Social Security benefits.

III. <u>The Medical and Other Records</u>

The medical records in this case are found beginning on page 354 of the administrative record. The pertinent records can be summarized as follows. The Court will also summarize other

records which the parties refer to in their memoranda.

When Plaintiff was nine years old she was admitted to Fox Run Hospital with a diagnosis of oppositional defiant disorder. She was noted as having been placed in a special program for students with ADHD for the next school year. She appeared easily distracted, and her full-scale IQ was measured at 58. Her discharge planning was to include individual and family therapy as well as psychiatric services. (Tr. 354-59). Three years later she was again hospitalized for psychological reasons, having been suspended from school for fighting with another student and then voicing suicidal thoughts. The impressions at that time included ADHD, the possibility of a dysthymic or depressive disorder, and mild mental retardation. (Tr. 375-77). The discharge diagnosis was major depressive disorder, and medication was prescribed. (Tr. 461-62).

In 2009, Plaintiff was evaluated by NetCare, where she went voluntarily seeking mental health services. She reported depression and anger as well as frequent mood swings. The provisional diagnoses included bipolar disorder, PTSD, and personality disorder. Her GAF was rated at 55. She was referred to North Central Mental Health Services for treatment. (Tr. 489-95). Her GAF was also rated at 55 when she was evaluated at Six County, Inc., in 2005. (Tr. 485-86). It appears she did not follow up with treatment following that evaluation.

Dr. Donaldson saw Plaintiff on October 20, 2009 for a psychological evaluation. Plaintiff told Dr. Donaldson that she was applying for social security benefits because she did not like to be around people and because she had difficulty understanding things. She was somewhat uncomfortable during the interview and was agitated and withdrawn. Her speech pattern was abnormal. She reported problems with her appetite, with sleep, and with crying spells. She had diminished interest in

-3-

activities and experienced feelings of worthlessness.  She had
problems concentrating.  Plaintiff also described anxiety in
social situations.  Dr. Donaldson concluded that Plaintiff was
intellectually impaired and had a limited amount of insight and
judgment.  Her full-scale IQ was measured at 54.  Dr. Donaldson
diagnosed major depressive disorder and generalized anxiety
disorder, but he did not diagnose mental retardation because he
could not determine if she had intellectual deficits manifested
during the developmental period.  He rated her GAF at 45-50 and
thought she had a "weak" ability to deal with simple job
instructions.  She had moderate impairments in the ability to
attend to relevant stimuli and to relate to others, as well as to
react to work stress.  She would need assistance managing any
benefits.  (Tr. 497-501).

Dr. Orosz, a state agency reviewer, completed a psychiatric
review technique form on November 24, 2009.  He evaluated
Plaintiff's disorders under Sections 12.04, 12.05, and 12.06 of
the Listing of Impairments, noting that she had a bipolar mood
disorder, "Borderline IQs," and PTSD.  As far as the "B"
criteria of these sections were concerned, Dr. Orosz found
moderate limitations in the areas of activities of daily living,
maintaining social functioning, and maintaining concentration,
persistence, and pace, with one or two episodes of
decompensation.  He found no evidence to establish any of the "C"
criteria for Listings 12.04 and 12.06.  (Tr. 505-18).  He also
did a functional capacity assessment in which he basically
concurred with Dr. Donaldson's conclusions.  (Tr. 522-23).  Dr.
Rosanova, another medical consultant, agreed substantially with
these conclusions, noting that Plaintiff was functioning in the
borderline range, could understand simple instructions, could
relate to others on a brief and superficial level, and was
limited to a work environment with only routine levels of stress

-4-

and change.  (Tr. 537).

Another psychological evaluation was done by Mr. Spindler, who saw Plaintiff on August 10, 2011.  She told him she had problems getting along with people when she worked, and that her depression and anxiety prevented her from getting a job.  She did not appear depressed and maintained good eye contact.  She reported no sleep or appetite disturbance.  She said she was "sometimes moody" and had anger issues but denied being depressed.  She could calculate change, knew the name of the president, recalled five of five objects after five minutes, and appeared to be functioning in the borderline intellectual range. She appeared to have an adequate level of knowledge for most aspects of daily living.  Plaintiff described her daily activities as doing household chores, visiting with friends, and watching television.  Her use of language suggested "a person more capable than her Full Scale IQ score would indicate."  She did not have any serious mental symptoms, and Mr. Spindler made no diagnosis on Axis I.  He rated her overall GAF at 61 and thought she could manage an unskilled position with elementary work assignments as well as deal appropriately with routine work stress.  (Tr. 538-43).

The last mental capacity functional evaluation was done by Dr. Voyten, also a state agency reviewer.  Dr. Voyten gave great weight to Mr. Spindler's evaluation because it was the most recent.  Dr. Voyten, too, thought that Plaintiff was functioning in the borderline range and for that reason was limited to simple, routine tasks, which she could carry out satisfactorily. She could work in a setting without fast pace or stringent time or production requirements.  She could have limited contact with others and needed a relatively static work environment.  (Tr. 80-85).

Plaintiff also refers to one of her IEP's done while she was

attending school.  That evaluation described, among other things, sub-par academic performance, social and communication deficits, and borderline cognition.  The IEP team concluded that Plaintiff needed a modified grading scale, individualized instruction, and environmental accommodations to reduce stress levels.  (Tr. 243).

IV.  <u>The Vocational Testimony</u>

Karen White was the vocational expert in this case.  Her testimony begins on page 54 of the administrative record.

Ms. White testified about only one of Plaintiff's past jobs, that of apple sorter.  She said that was a light, unskilled job which required constant handling and sitting and occasional reaching.

Ms. Harris was then asked some questions about a hypothetical person of Plaintiff's age, education, and work experience who could work at any exertional level but who had to avoid concentrated exposure to hazards such as moving machinery and unprotected heights.  That person could understand, remember, and carry out simple, routine tasks which did not require much in the way of independent judgment or decision-making.  Any tasks had to be done without stringent rate-based speed or rate-based production quotas.  The work setting had to be stable with changes being introduced only on a gradual basis, and the person could not do any tasks requiring intensely focused attention or concentration, such as an assembly line job which involved constant attention to the work.  Lastly, the person could have only occasional contact with coworkers, supervisors, and the public.  According to Ms. White, someone with those limitations could work as a laundry worker, a stores laborer, or a cleaner, although if the person could do only very simple reading and writing, the laborer job would be problematic.  A person with those limitations could also be a laundry bagger, however.

Ms. White was also asked whether someone who was off task

-6-

ten to fifteen percent of the time could be competitively
employed, and she said that fell within tolerable limits.
However, being off task 20 to 25 percent of the time did not.

V.   The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 13-
23 of the administrative record.  The important findings in that
decision are as follows.

The Administrative Law Judge found, first, that Plaintiff
had not engaged in substantial gainful activity since her
application date of June 17, 2011.  Going to the second step of
the sequential evaluation process, the ALJ determined that
Plaintiff had severe impairments including bipolar disorder/major
depressive disorder, generalized anxiety disorder, personality
traits, post-traumatic stress disorder with delayed onset, mild
mental retardation, and a history of attention deficit
hyperactivity disorder.  The ALJ also found that these
impairments did not, at any time, meet or equal the requirements
of any section of the Listing of Impairments (20 C.F.R. Part 404,
Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process,
the ALJ found that Plaintiff had the residual functional capacity
to perform work at all exertional levels, but could not tolerate
concentrated exposure to workplace hazards, including unprotected
heights and dangerous machinery.  Further, she could understand,
remember, and carry out simple tasks that required the use of
little independent judgment or decision-making on a sustained
basis without stringent speed or rate based production
requirements, meaning no fast-paced assembly line work.  She
could work only in a stable setting where there was little change
in terms of tools used, the processes employed, or the setting
itself, and change, when needed, was introduced gradually.  She
could not do tasks which required intensely focused attention and

-7-

concentration and she could interact with the public, supervisors, and coworkers only occasionally. Finally, she could only perform tasks that required only very simple reading, writing, or math as part of the job duties.

The ALJ found that, with these restrictions, Plaintiff could do three of the jobs identified by the vocational expert - laundry worker, cleaner, and laundry bagger. The ALJ further found that such jobs existed in significant numbers in the regional and national economies. Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI. <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ should have found that Plaintiff's impairments satisfied the criteria of Sections 12.05(B) and 12.05(C) of the Listing of Impairments; and (2) the ALJ erred when he did not assign a specific weight to the opinion of Dr. Donaldson, the only source who both tested and examined Plaintiff. These claims are evaluated under the following standard.

<u>Standard of Review.</u> Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" <u>Id</u>. <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir.

-8-

1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

A.  <u>The Listing of Impairments</u>

Plaintiff's first claim of error is that the ALJ did not have a substantial basis to support his findings that she was not disabled under either of two mental health Listings, subsections 12.05(B) and 12.05(C).  She faults him for providing no evaluation of subsection (B) and also for doing an inadequate analysis of whether she met the criteria of subsection (C).  The Commissioner responds that in light of the evidence that Plaintiff was able to function adequately and that no mental health professional had ever diagnosed her with mental retardation (as opposed to borderline intellectual functioning), she did not meet her burden of proof with respect to either subsection of Listing 12.05.

Subsections 12.05(B)and 12.05(C) are both part of the Listing for intellectual disability (formerly called mental retardation).  To satisfy either section, a claimant must show "significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, *i.e.* ... before age 22."  In addition, to satisfy subsection (B), the claimant must have a valid IQ score of 59 or less; to satisfy subsection (C), the claimant must have a valid IQ score of 60 through 70 and also have some other

-9-

impairment which imposes "an additional and s]ignificant work-related limitation of function...." The record contains the results of IQ tests within these ranges, and the Commissioner does not argue otherwise. However, the Commissioner asserts that there is no evidence of deficits in adaptive functioning, and that the ALJ reasonably found that Plaintiff functioned at a level inconsistent with Section 12.05's description of intellectual disability.

Although the claimant has the burden of demonstrating that her impairment meets the criteria set out in the Listing of Impairments, the ALJ, at step three of the sequential evaluation process, must perform an adequate analysis of that issue. As the Court of Appeals has explained, at that stage of the process, "the ALJ need[s] to actually evaluate the evidence, compare it to [the appropriate section of] the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." Reynolds v. Comm'r of Social Security, 424 Fed. Appx. 411, 416 (6th Cir. April 1, 2011). This Court has noted that "where ... the ALJ fails to complete a required step in the five-step analysis, the proper course is to remand the case for him to complete his task. Requiring a reasoned and explained conclusion is not merely a formalistic requirement. On the contrary, as noted by the Sixth Circuit, it is a necessary component for this Court to ascertain whether the ALJ's decision was supported by substantial evidence." Risner v. Comm'r of Social Security, 2012 WL 893882, *5 (S.D. Ohio March 15, 2012).

Here, the ALJ analyzed the Section 12.05 issues in this manner. First, he recited his conclusion - that Plaintiff's impairments "considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.04, 12.05, 12.06, and 12.08." (Tr. 16). He then discussed the paragraph

-10-

"B" criteria (which are also the Section 12.05(D) criteria) and determined that Plaintiff had moderate difficulties in two areas, mild restrictions in her activities of daily living, and no episodes of decompensation, so those criteria were not satisfied. The ALJ then considered the paragraph "C" criteria of sections 12.02, 12.04, 12.06, and 12.08, finding that they had not been satisfied either.  Last, the ALJ examined Section 12.05.  He did not mention subsection (B) explicitly, but in reference to subsection (C) found that although Plaintiff had some qualifying IQ scores, "the record does not include evidence of deficits of adaptive functioning."  He noted that neither Dr. Donaldson nor Mr. Spindler could identify such deficits and that the record indicated Plaintiff had various abilities including being able to obtain a driver's license, send text messages, watch television, play cards, prepare meals, and visit with friends.  (Tr. 17).

Although Plaintiff is correct that the ALJ never explicitly analyzed subsection 12.05(B) separately, any error in that regard is harmless.  As noted above, both that provision and subsection 12.05(C) share a basic requirement, that of deficits in adaptive functioning manifesting themselves prior to age 22.  The ALJ adequately addressed that prerequisite in connection with subsection 12.05(C) and provided the Court with a rationale that can be reviewed.  Thus, the only remaining question is whether the ALJ's conclusion about that matter is supported by substantial evidence.

Plaintiff's first argument in this regard rests on the fact that the ALJ found one of her severe impairments to be mild mental retardation.  Since, by definition, that impairment exists only if someone has deficits in adaptive functioning which manifested themselves prior to age 22, she contends that the ALJ made that finding and was bound by it with respect to the issue of whether she satisfied subsection 12.05(C).  The Commissioner has not responded to this argument.

Plaintiff has not cited any authority which supports the proposition that the seeming contradiction between the step two and step three findings compels a remand. The Court has found a number of cases where ALJs have made similar and seemingly contradictory findings; in most of those cases, the plaintiff did not directly raise the issue, and the reviewing court simply analyzed the question of whether the step three finding was supported by substantial evidence without mentioning the fact that the ALJ found that one of the plaintiff's severe impairments was mental retardation (and not borderline intellectual functioning, which is what an ALJ usually finds when a claimant has qualifying IQ scores but has not shown the required deficits in adaptive functioning). An example of this approach is this Court's decision in Fulton v. Colvin, 2015 WL 519440 (S.D. Ohio Feb. 9, 2015).

However, when the conflict issue is raised, some courts have held that the ALJ should be asked to explain the contradiction. For example, in Williams v. Colvin, 2014 WL 4093104, *4 (M.D. Ala. Aug. 19, 2014), the court agreed that "[t]he ALJ's express finding that plaintiff presently suffers from the severe impairment of mild mental retardation conflicts — given the DSM's 'essential' diagnostic features of this mental impairment — with the ALJ's step three finding that plaintiff does not satisfy the 'capsule' definition of mental retardation in the introductory paragraph of Listing 12.05...." Because the evidence in the case could support either finding, the court remanded the matter, noting that the court could not affirm the decision without weighing the evidence de novo. Id. It is also useful to note that in many cases - Monroe v. Astrue, 84 F.Supp.2d 961 (D. Minn. 2011) being a representative one - once the ALJ made a step two finding that mild mental retardation was a severe impairment, the discussion about subsection 12.05(C) centered on whether there was another impairment which imposed additional and significant

-12-

limitations of function, and not whether the step two finding
could be discounted by determining that the claimant did not, in
fact, meet the diagnostic criteria for mental retardation.

Perhaps if this were the only issue relating to the question
of whether Plaintiff can meet subsection 12.05(C), the Court
might conclude that the ALJ's decision, although clearly
contradictory, should simply be scrutinized to see if substantial
evidence supports the step three finding.  But when that
contradiction exists and there are also other issues which would
benefit from clarification, a remand seems the wiser step.  See,
e.g., Lott v. Colvin, 772 F.3d 546, 551 (8th Cir. 2014)(remanding
case where the ALJ made a step two finding of mild mental
retardation, a step three finding that the claimant's mental
impairment did not satisfy the criteria for mental retardation,
and there were other unclear issues, noting that the claimant's
arguments "support a remand to the ALJ to resolve both the
internal inconsistencies in her decision and the unexplained
inconsistencies" in other areas of the decision).

Here, in addition to the conflicting findings made by the
ALJ, the Court notes that one of the bases of the ALJ's step
three decision not to find intellectual disability (despite the
abundance of very low IQ scores) was the statement made by Dr.
Donaldson about why he did not diagnose mental retardation.  But
Dr. Donaldson did not say that Plaintiff did not experience
deficits in adaptive functioning during her developmental period,
only that he had no documentation about whether she did.  Another
basis was the ALJ's statement that the record did not contain
such evidence, but there are school records which could be
interpreted to show such deficits, and, arguably, other evidence
as well, as detailed in Plaintiff's memorandum.  See Doc. 10, at
15-17.  Finally, as Plaintiff points out in her reply, there is
guidance from the Commissioner about how to interpret the ability
to perform basic activities of daily living which may inform the

ALJ's decision on remand.  For all these reasons, the Court should order a remand based on Plaintiff's first claim of error.

B.  <u>Weighing Dr. Donaldson's Opinion</u>

In her next claim of error, Plaintiff argues that the ALJ erred by not evaluating or discussing Dr. Donaldson's opinion in that section of the administrative decision dealing with Plaintiff's mental residual functional capacity.  Plaintiff points out that, by regulation, the ALJ is required to consider opinion evidence from consultative examiners using the same criteria which apply to treating source opinions.  <u>See</u> 20 C.F.R. §404.1527(e).  The Commissioner contends, in response, that the failure to assign weight to or more thoroughly evaluate Dr. Donaldson's opinion was, at most, harmless error because Dr. Donaldson's view of Plaintiff's residual functional capacity was not materially different from the RFC determination made by the ALJ.

The Court agrees that it was error for the ALJ not to give any meaningful consideration to Dr. Donaldson's opinion when evaluating Plaintiff's residual functional capacity.  <u>Cf</u>. <u>Morrison v. Comm'r of Social Security</u>, 2014 WL 7409752, *12 (S.D. Ohio Dec. 31, 2014)("the ALJ erred by not explaining how she weighed the opinions of the non-examining state agency psychologists").  The brief mention of Dr. Donaldson's opinion at Tr. 19 is not sufficient to persuade the Court that the ALJ performed his regulatory duty.  Consequently, the Commissioner correctly focuses on the issue of whether the error is harmless, meaning that it had no material effect on the outcome of the case.

The Court is not entirely persuaded by the Commissioner's argument.  Dr. Donaldson concluded, for example, that Plaintiff had a "weak, but not impaired" ability to deal with simple instructions.  These two descriptions of Plaintiff's ability seem to be different, but the ALJ made no attempt to reconcile them.

-14-

Also, the GAF which Dr. Donaldson assigned (45-50) is indicative
of serious symptoms, but the ALJ did not discuss it.  Since a
remand should be ordered based on Plaintiff's first claim of
error, it is not actually necessary to decide if her second claim
would also support a remand, but on remand the ALJ should
evaluate, discuss, and assign appropriate weight to Dr.
Donaldson's opinion, as the regulations require him to do.

### VII.   Recommended Decision

Based on the above discussion, it is recommended that the
Plaintiff's statement of errors be sustained to the extent that
the case be remanded to the Commissioner for further proceedings
pursuant to 42 U.S.C. §405(g), sentence four.

### VIII.   Procedure on Objections

If any party objects to this Report and Recommendation,
that party may, within fourteen (14) days of the date of this
Report, file and serve on all parties written objections to
those specific proposed findings or recommendations to which
objection is made, together with supporting authority for the
objection(s).  A judge of this Court shall make a de novo
determination of those portions  of the report or specified
proposed findings or recommendations to which objection is made.
Upon proper objections, a judge of this Court may accept,
reject, or modify, in whole or in part, the findings or
recommendations made herein, may receive further evidence or may
recommit this matter to the magistrate judge with instructions.
28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to
object to the Report and Recommendation will result in a
waiver of the right to have the district judge review the
Report and Recommendation de novo, and also operates as a
waiver of the right to appeal the decision of the District
Court adopting the Report and Recommendation.  See Thomas v.
Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d

-15-

947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge